Your Honor, this is the first case of the afternoon. Call 213-0591. Chris Cherekos and Susan Cherekos v. Lindoo Installations, et al. On behalf of the Avalanche, Mr. T. Patrick Bryce. On behalf of the Avalanche, Mr. Jeffrey R. Rosenberg. Thank you. Mr. Bryce, you may proceed. Thank you. Mr. Bryce, we have felons, plaintiffs. This scenario is basically about what we believe to be a con job by the defendants as far as setting up the plaintiffs to come to work for them. As you can see and you read from the arguments, the plaintiffs and their entire family based their reliance upon the defendants. They promised to provide the business to them for sale, and they didn't do that. But more importantly, the difficulty that I see with this matter deals with electronic media and how you can bury evidence and not allow a party to go ahead. If you look at the chronology that we set forth in the depositions and so forth, Mr. Lindoo in his initial deposition gave us three emails. Ronald Lindoo gave us four. Then subsequent to that, we got 752 pages of emails in written manner. We had to go through a year or two with the trial court to try and find out more of the emails. Now, the emails were important because of the written documentation confirming the agreement between the parties. But there were no specifics really in those emails with regard to any terms of the sale of the business, were there? I disagree with that because if you look at the expert's report that was provided, and it's a part of the record here in this case, and that was by Mr. Chaplin. He specifically said that there were, and I think this is very important because instead of wiping clean, pursuant to the inspection, all emails, which you would do, there were targeted emails that were omitted. Excuse me, wiped clean. So are you saying that because only certain emails were destroyed that the allegation is then that those are the emails that contain definite and certain information or facts supporting the terms of the sale? To answer your question, yes. Secondly, though, if you look at the report, I can cite the page of the record. There are specific dates that Mr. Ricos referred to in the interesting derogatories in the very detail, referencing meetings between the parties. And those were wiped clean. And on top of that, in his report, he did say that he found emails from 12-1108, 119-09, and 414-09 that the emails showed that they had been in negotiations for the purchase of the business. So there was specific reference to what was going on as far as the terms of the agreement. So you're submitting that in those emails that were allegedly destroyed, they have the terms of this agreement in those emails? I am. I am. Why didn't your clients testify to those terms? We don't have a set purchase price. We don't have a set time frame. We don't have a set purchase price except for the fact saying that there was going to be – that there was an agreement to purchase and they were negotiating that regard and that he promised to do that. Now, I freely admit that they said that there was going to be a work-over-time period. This goes to really the count three, the oral agreement in that regard, that you have a time period involved in how much money is going to be set forth. I freely admit that. But if you use – which the jury instructions allow us to do – If you move away from it, it doesn't record as well. I apologize. So I'm sorry. I don't mean to limit your movement so much, but if you can stay within range of the microphone, I would help, please. I apologize. If you – I lost my train of thought. I apologize to you. I'm sorry. That's quite all right. If you utilize, however, the circumstantial evidence, which we're allowed to do in a jury case, you can sit there and look at everything that transpired from the day that Susan Sharifas was hired, then her husband comes on board, then her son-in-law comes on board. The employees recognize from the documents you read, the employees testify that they are the bosses that are going to take place. Lindu has a heart attack and tells them that he's going to give them the business. So you're not only looking at the emails. You're looking at circumstantial evidence that they're taking over this business. They go to a customer, a customer down in Tennessee while they're working, and they tell him, listen, we're going to mend fences. He says, okay, fine. We understand you're going to take over the business. That goes to promissory estoppel, which we cited, which bluntly, I think, is our strongest position besides the fraud. What was the detrimental reliance for the promissory business?  What did your clients do to their detriment in reliance upon this promise to buy the business? They worked there. They were hired, and they were guaranteed they were going to be able to buy the business. They both left. They both got jobs that were equivalent, if not better, than what they were getting paid in the business world. Well, sure, but I wouldn't expect them to go out on employment. I don't mean to be rude, but, I mean, I wouldn't expect them to sit there and do nothing. But they didn't testify that they wouldn't have worked there if they weren't going to buy the business. Just Susan Sirico said. But once it became clear that Susan was going to be able to buy the business, then her husband came on board, and that was the condition which he testified to in his deposition, all right, that he would not have gone there but for the fact that they were going to buy the business. I understand where you're coming from initially, but things changed as she worked there when he offered her the sale of the business. You have to remember, Lindu offered throughout the time period to sell the business and got her to agree to do it. Did they ever talk? Did Lindu ever give her a dollar amount, a specific dollar amount for the charge or the cost of this business? Lindu gave her a dollar amount, but that's the specific part that's missing. He gave her a dollar amount. Did she testify to that dollar amount? No, no, no, no, not that I can recall. She did testify, however, as far as the specifics of what was going to transpire. Now, that's important to me because if you look at it, and I cited this, the answers to interrogatories in this matter, and I think it's RC-166, you can look at all the specifics that are written now as far as the planners' answers to interrogatories, the dates, the times, what was discussed. And if you look at the deposition of the Lindus, I don't remember. I don't recall. I don't remember. So then we get into this electronic media situation to back us up, which is destroyed, which is destroyed. If I'm trying to stay close, if I'm trying a lawsuit in front of a jury, I'm going to sit there and say, who has more specifics as far as what transpired, like dates, times, and so forth? Is that what makes a contract, who has more specific facts than who doesn't have more specific facts? If we sit there and look at, Judge, we sit here and say, this is a case which I said in my brief. He said, she said. Right. All right. If I said that in my brief, who's going to prevail? The ones with more facts and the ones with more specifics and things to back it up, or the ones who targeted and destroyed emails of electronic media? Yeah, but those are issues of fact for the trier of fact. Do we even get there when you don't have enough terms or enough information to make a contract? I think you do because it's foliation. I do. And let me tell you what. But, Mr. Rice, if you had this foliation, my question, what I'm struggling with is, why is it they did not testify to these terms that were allegedly in these emails? Well, they do have testimony in the derogatory answers. I mean, the derogatory answer is the same as it's a sworn statement. I mean, there's no issue about that in their regards. What concerns me about this case, and I think should concern the court, is we're sitting here with emails of electronic media. Now, if I'm sitting here with a medical malpractice case and somebody destroys evidence, I mean, I'll be honest with you. I looked up and I tried to find an appellate court or a Supreme Court decision dealing with this. I know, Justice Berger, I think you wrote one on this issue, which I've read. How do you, I mean, you get to the point. Whereas, where do you draw the line on what is there or isn't there or what can be destroyed or what's targeted or not? You're making law, not only this case, but for cases around the state. And I fully understand that. But if somebody can take emails of electronic media, which is what we're talking about here, and pick and choose, which from the inspection, it took a year or two to look at, and pick and choose what's taken or destroyed, that's a question of law for the courts in Illinois. And that's what happened here. To prevent these people from bringing a case, whether it be on fraud, which this man had done before, as I cited, Douglas Friedman brought a case. He did that before on a scheme to defraud. One. Two, I'm promissory of Staple, which we met the elements on the options, as I cited in my restatement, second. And the oral contract, I clearly admitted in the reply, is my weakest point. It would be strong if I had the emails or the electronic media. And I admit that. I mean, there's, I'm freely admitting they're false. I think we're kind of going through this a little bit, but what are the specific terms? I mean, your clients would be aware of the specific terms that would have been in the emails, that you do not now have to prove their testimony. But the testimony is, I was going to go to a lawyer once we had specific terms. I never went to a lawyer because we never had specific terms. Now, I'm talking more about the contract, which you were focusing on now, not necessarily the promissory of Staple or the fraud, but focusing on the contract. I mean, how are you proving an exfoliation case where you have to show the destruction of the evidence caused you to be unable to prove this when we don't know what's in the emails? We don't know what your clients, I mean, your clients have testified that there were no specifics, so there aren't going to be any specifics in the emails. I respectfully disagree with you as far as there were no specifics. Well, I mean specifics as to terms, such as price and time. I think there were specifics as far as the duration of time. They were going to earn the amount that were payable. She did talk about 5 percent down, if you recall from reading the deposition, 5 percent down throughout the time period, credit for the time, and then an amount subsequent thereto after two or three years. Now, are they specifics the way you and I would like them? No. I'll freely admit that. No doubt about it. Are there more specifics in the emails? I don't know because I don't have them. I'm being very honest with you. I don't. Did your clients ever pay any money toward the purchase of this? I mean, they talked about 5 percent down. Did they ever pay any money toward the purchase of this business? No, because there were still negotiations up until the time. And they received their salaries during this entire time? Susan did. Mr. didn't? The first month Mr. worked for free to learn the business. Right, December of 08, but then in January of 09 he was hired. That was the agreement. January of 09 he was hired at $70,000 a year, and then he worked that entire year until January of next year. I believe that's true. So he got the full $70,000, correct? I believe that's true. I can't. I believe that's true. Mr. Royce, weren't these comments and these statements made promises to do something in the future? Basically is what it was. I think that's what promissory estoppel is. And you're alleging under the intentional misrepresentation or the fraud that there was an alleged scheme. I am. I am. And did you plead with specificity or was there any testimony or any answers to interrogatories what that alleged scheme was? Mr. Lindu had a prior relationship with an individual named Freedman, and he conducted the same situation, and I believe that's in the second amendment complaint, and did the same thing. Mr. Freedman had to sue Mr. Lindu, which went to a trial, but Mr. Freedman only sued him for salary and expenses, and Mr. Freedman prevailed in the underlying suit in Kane County. It was the same exact scenario where Freedman had been promised the sale of the business by Lindu, and Freedman got out, and Lindu fired him. And this goes to another point. If you look at this, the Chiricos were not fired for cause or anything. They were just told to come in what they had fired, and there was no cause here. Were they fired or were they told that E. Dale Water wanted to sell the business? No, they were fired. He said that we're going to shut down the business because the economy is bad. That business is still on. It's still been going on. I put that in the brief. They weren't employees at will, were they not? I believe they were. But we go back to promissory estoppel. But again, detrimental reliance. I mean, promissory estoppel seems to be, you keep getting back to that, so it seems to be a main point here, and one of the elements of that is detrimental reliance. Absolutely. You've indicated that the detrimental reliance was the employment, that they remained in the employ. And the sale. Pardon me? And the sale. Well, no, because they were promised the sale, they stayed working. That's how they relied to their detriment, by working that year. Agreed. But they were paid that year. They didn't pay any money for the business. They were paid for their efforts. She was getting a salary that she received. He was getting a salary that he received. Right? I mean, during this year time, they were all getting paid. You're absolutely right. And he was unemployed when he got this job. And got another job for a substantially the same amount of money. That's correct. No, I'm not talking about after. I'm talking about before he decided to take this job into some of the weight. He was unemployed, was he not? Well, sure. But that's saying somebody can't get a job somewhere else. If you're offered the situation to buy a business as a family, why wouldn't you try and do that? No, I agree. Certainly I understand that. But I'm just trying to, if I'm working at a place for $70,000 a year and somebody promises to sell me the business, but I don't give that person any money, I don't know how much I'm paying for it, and I get my $70,000 for the year, where's the detriment? If I sit here and say, and I'm 25 years old, not what I am now, and somebody says, okay, you work for me five years as an attorney and the business is yours because I'm going to turn 65, and I get paid for the five years that I'm working there knowing that I'm going to get the business, just because I got paid for those five years doesn't mean I can't rely upon the business being given to me. Just because I get paid for five years? That makes no sense to me. But rely to what end? I mean, what rely? Am I allowed to talk? You may answer the question. I'm sorry. I was told to do that. No, thank you. That's important that you're cognizant of our rules. Thank you. So what would you, you said you're entitled to rely on that. Sure. To do what? You're relying on that promise to stay there, is that it? You're going to finish out the five years? To get the business. No, to get the business. To get the business, whether it be the profits, the business, whatever it may be that I worked for for the five years to get there. I mean, that's why I stayed. If I got other offers from somewhere else, I'd leave, except for the fact, knowing that I was going to get that business. I was going to pay them to get that business. Thank you. Thank you. Mr. Reichert, you're on time for rebuttal. Mr. Rosenberg, you may proceed. Please. Good afternoon. My name is Jeffrey Rosenberg. I'm counsel for the defendants of Hallie Lindu Installations Inc., William Lindu, and Rhonda Lindu. The court has stole my thunder a little. Obviously, pinpointing the key issues, but I'll try and reiterate those key issues that you raise and that I believe and agree with you are the key factors of this case. Let me ask you a question first. Yes, Your Honor. We were talking about detrimental reliance, and Mr. Rice indicated that Mr. Scherkos relied to his detriment by working there based upon the promise that the business would be given to him, or sold to him, not given to him. Sold to him. How is that not detrimental reliance? I would agree with Your Honor's take on it, which is that the evidence showed that Mr. Scherkos was unemployed for several, if not more, months prior to getting a job at Lindu. He had no income, no money. He then took the job at Lindu, worked for a year, and received a full salary of $70,000. After he was terminated from Lindu, within a month he received another job for approximately the same, maybe a teeny bit more, money. There was absolutely no reliance, no damages on Mr. Scherkos' part, as was if there was an alleged agreement or an alleged promise. There's absolutely no reliance, no damages on his part with respect to that promise. But he didn't rely on that promise in terms of his coming there to accept that employment and staying there during that period of time? I don't think he did. He didn't do anything different than he would have done otherwise. He had an opportunity to make $70,000 a year, where beforehand he was making nothing. Well, couldn't he have had the opportunity of making $400,000 a year if he was owner of that business in two or three years? He certainly would have that opportunity, but that element of damages is not evident in this case. That is a breach of contract. If they would need to prove a contract, prove that an actual contract existed for him to buy the business, and then maybe they would have some chance of proving those damages. In terms of relying on owning a business because of a promise, that is not an element of damages. What are your damages? I'm sorry, go ahead. No, go ahead. What are your damages as a result of relying upon a promise? What did you give up? That's the element of damages for fraud and promissory estoppel, which are the causes raised here today. He didn't give up anything. He got something. He got a substantial salary. He didn't lose anything by being terminated because he retained that salary. So, therefore, he didn't rely to his detriment in any way upon this alleged promise. Well, how do we know that the specific terms of this sale were not contained in those e-mails that were wiped clean and deleted? I think that's a very good question, and the answer is easy. Let's take, for purposes of this argument, let's take exactly what the deposition transcript says. Let's take exactly what the responses to written interrogatories say. Let's take all those terms. Let's interpret those in the favor of the plaintiffs as much as possible, and you still don't come remotely close to having enough definite terms to create a statement necessary for fraud, an unambiguous promise, or a valid contract. Susan Cherikos admitted there was never a price agreed to, ever. There was never a time for performance. There was never an agreement as to what Bill Lindell's salary would be. Counsel just admitted they were still in negotiations throughout 09. That's why she never went to go see a lawyer. She never went to go see an accountant. There was never any, there weren't really any negotiations because there were no prices bandied about. There were no terms at all. There were no terms at all. The terms that, and I tried to bend over backwards to put those terms in my brief, which were she claimed that there was 5% equity of the salary. Again, counsel admitted that was never taken out of their salaries, but let's even say it was. Their salaries were $70,000. 5% of that is $3,500. Over a year, let's say two years, what is that, $10,000? Mr. Lindell testified the business was worth a couple million. Ms. Cherikos testified that in her mind, and that's a key point, she thought the business was worth a million dollars. We still have $990,000 left. There was never any discussion as to how that would be paid, when that would be paid, where that would be paid, how the Cherikoses would get that money, whether Mr. Lindell would stay on, how long he would stay on. Nothing even remotely approaching a statement of material fact, an unambiguous promise, or the terms of a valid contract. I understand that argument as it relates to terms of a valid oral contract. But as far as an unambiguous promise, do specific contract terms have to be set in order for there to be an unambiguous promise? I would agree you're probably right that it's maybe a lesser standard, but still a standard nonetheless. An unambiguous promise must contain definite terms so that a court can ascertain what that promise is. And clearly, and the case law cited, and again, the terms that I talked about, it would be impossible for a court, for a jury, to ascertain what was that promise. You can't just say, oh, I promise I'm going to sell you the business. That undoubtedly is not nearly enough to constitute an unambiguous promise. With respect to Mr. Rice's statement concerning the intentional misrepresentation of fraud, the scheme, you heard what Mr. Rice said about the scheme, that he had done this to someone else. His company had done this to someone else in the past, and that this was his intention to do the same to the plaintiffs here. How do you respond to that? I would say a couple things about that. First of all, there is no evidence of a scheme. What was his scheme? To enter into a fake agreement to sell the business for what purpose? Ms. Chirico has already stated she was going to continue working at Lindu no matter what, whether there was an agreement to sell the business, an offer. What type of scheme is there? There's clearly no evidence of a scheme. To get the husband on board to do his job. I mean, she was doing her job all along, but it seems like the husband came on board and did his job while he sat at home. Well, even taking an extremely liberal view, what was the scheme with the previous employee? There was no indication that he had a wife or a family member that was supposed to come aboard. Those two incidents were so not related to each other that the idea that a conspiracy, a scheme, as you know, is a high standard. Excuse me for interrupting. She took on more and more responsibilities. In essence, she was running that business. He had illness. He had other reasons to pull back from the business. So she got the same salary, but she was taking on more and more responsibility. One would presume or infer that's because of the promise to sell her the business. She knew that if she did that, one, she was learning the business, and two, there would be a reward at the end. I think even prior to the agreement, she had achieved more responsibility, and there was not a lot of employees at Lindu. She was the main person running the office. So naturally, she would obtain more and more responsibilities as she went forward. No, but the responsibilities that he had, that the owner of the business had had originally, got passed on to her, especially when he became ill. Well, there's no indication that she would not have done those things if but for this agreement or she did these things in a direct relation to this agreement. And, again, that has nothing to do with any type of a scheme which requires, i.e., more than one thing. They're completely interrelated. And I will go on to say that this whole scheme exception, because remember, this was a promise of a future intention. That's really plaintiff's only argument here. They know there are no material terms. So what they did in their brief was they argued this scheme exception. And I would say that in addition to there not being any evidence of a scheme, this whole scheme exception is a very vague and unsettled area of the law, which, if you look at the cases cited, is barely mentioned, is barely discussed. And is not applicable in this case because even if there is a scheme, that does not relieve the plaintiffs from having to prove all the other elements of their causes of action. For example, in the fraud claim, there are five elements to a fraud claim. If you look at the commonwealth mortgage case which we cite, it's very similar to this case where the plaintiffs, again, in that case, allege the scheme. Well, the court said, regardless of whether this scheme exception applies, it doesn't matter whether it was a future intention, whether it was a scheme, whether it was a promise, you did not fulfill all the other elements of a cause of action for fraud. In the commonwealth case, the promises were too vague. In that case, it was a loan. There was no amount. There was no specific time for performance. There were no interest rates. It was very, very similar to this case. And the court held, regardless, even if you had a scheme, even if you had a promise for future intention, it doesn't matter because you don't have a definite promise, a statement of material fact. And therefore, the court rejected the fraud claim as well as the breach of oral contract claim that was submitted by the plaintiffs as well. So I think that is the situation we have here. We don't have a scheme. There's not even close enough evidence to meet that standard. We don't even know if that's a legitimate argument. But even saying, okay, let's give the plaintiffs those two things, we still have to reach those five other elements. And so far, we've just talked about a statement of material fact, an unambiguous promise. You touched upon reliance. There was no reliance. There was no damages. What damages? They both made a lot of money in that year. There was no damages. So there was no intent to deceive by the defendants. Susan Cherikos herself testified she believed that Mr. Lindu was being honest when he said, sure, I'll sell you the business. And, in fact, Mr. Lindu said to other people, if you'd like to buy the business, make an offer, as he said to Ms. Cherikos. He's not lying about that offer to sell the business, as Ms. Cherikos herself testified to. She testified that he later changed his mind about selling the business, which is possible, but there's no evidence that he intended to deceive anybody by doing so. And, in fact, or induce reliance. And, in fact, no reliance was induced. What happened to his wife? She was in the business, too, wasn't she? Ms. Lindu was in the business, and she still is in the business. She was. But during this, when the Cherikos came in, she kind of was out of the business as well, wasn't she? She did more of the backroom financial stuff. I believe she still does that, some of that counting and that type of information, that type. So I don't think she had a lot of interaction with the Cherikoses. And I don't think there's any allegations that she really made any specific statements regarding a sale, et cetera, besides general statements to the plaintiffs. So the last point I'll touch on, if you have no more questions, is exfoliation, which, again, I'll give plaintiffs. It's a summary judgment, so you are allowed to take what he says is true, even though there's not much evidence for it, in the record. But the law is, unless the spoiled evidence, the allegedly destroyed evidence, caused the plaintiffs to lose their underlying lawsuit, there is simply no proximate cause and no cause of action for spoliation. The trial court judge was very specific. It doesn't – I mean, unfortunately, it wasn't specific in his order, but in his response, he said that no matter what those emails said, you could take any line from the deposition, you could take the response to written interrogatories verbatim. The interrogatory said, what are the terms? There was a paragraph on what these terms were. There was nothing specific. The plaintiffs and their counsel had time to sit down, write down what are the terms of this agreement. They couldn't come up with anything, simply because there were no terms. So there is no way that those terms could support a cause of action for fraud, breach of contract, promissory estoppel. And it's your position that those terms were never in those emails, thus that they were destroyed? Well, no, my position is the terms that were set forth in the deposition, the vague terms, which may be the 5 percent, may be in two or three years, those very vague terms may or may not be in those emails. But presuming for purposes of this proceeding, that they were in the emails, the 5 percent. But it's your position there's nothing more than that in those emails? That's inconceivable because the plaintiffs would certainly have testified to that, that they were given an opportunity. What are these terms? What could possibly be in these emails? And they were unable to do so for the simple fact, unescapable fact, that there were no terms. Thank the court for its time today. And we obviously request that you affirm the trial court's two summary judgment rulings in this case. If you have no more questions, I will retire. Thank you, Mr. Rosenberg. Thank you for your time. Mr. Rice, rebuttal argument. The counsel talks about we don't meet the elements of promissory estoppel. In my brief, I indicated, number one, and this combines the restatement, second, there was an unambiguous promise to the plaintiffs. While there was a promise, as we have alleged, to sell the business or give them the business, they relied upon that promise. Does it have to be more specific? I mean, counsel seems to be arguing that there has to be more specifics involved. I don't think so, because if you think about what the counsel just said, there's no number involved. Well, let's say that the business changed in five years from the time that somebody comes in. You're going to want an accountant or somebody to look at it in the five years to determine the price. I mean, anybody would do that as far as any business is concerned. So the emails that we talked about had the specifics of the negotiations. Now, counsel sits there and says, well, I can't stand by that. He's speculating, just like I am, except for one thing, that my expert said that the emails that were wiped clean had talks of negotiations in them, which would have specifics on it. I have an expert in this case, and nobody else does. Why didn't your clients testify or put in their interrogatory those specifics? I think the interrogatories, and I don't have them in front of me. I apologize. I think the interrogatories were very specific as far as the dates and the discussions that took place in October, November, and December, which, if you recall, Mr. Lind, you said, I don't recall. I don't recall ever meeting. I don't recall. I can't sit here and tell you what's there because I don't have the interrogatories in front of me. They were cited in the brief. But it was very specific as far as what was discussed as far as the promises and so forth and the negotiations and the dollar amounts, if I recall correctly. So there were members and things discussed, which goes to promissory estoppel and reliance. It's not just the plaintiff, Susan, and her husband. It's the son-in-law who went to work there who was in the brief. It's the daughter who worked there. They were all coming on board, the workers who said they were in charge, which, Judge, you referred to. Everybody said they're taking over, I mean, and the business people. And then they all of a sudden come up and blank them to say you're gone. I'm sorry. Counsel argued that you haven't shown any damages, that, again, we get back to the making a salary and that. I mean, what did you do? You have to show something such as he turned down, he made Mr. Sheriff has turned down offers during this year when he was working there. I don't believe so. I'll be very honest with you. I don't believe so. I think you have to sit there and say the damages are the profits from the business, which I put in the last paragraph of my brief. I remember that. As far as the lost profits that they've had and the loss of the business, as far as the sale. Now, is that something that would have been determined at trial? Yes. Is that something that we determine now? No, because summary judgment was granted. I mean, that's something I would have had the burden of proving at trial. How much do we how do we know how much they would have lost if we don't know how much they would have paid for the business? We don't know yet. I have to admit that we never got to that step. Because we didn't go past the point of disfoliation, the destruction of evidence. We never got to the point of proving at trial what it would have been. If I can't prove damages, I lose. I'm the first one to admit that. But we never got there. All we had was the inspection. I found out that the emails had been destroyed and it prevented the claim. I mean, I can't go forward. Is that a burden of mine later on? Absolutely. It would have been. But these are issues of fact that you raise that I never had a chance to prove. There are issues of fact in this. I can't go forward in light of disfoliation. I have to stress that more and more. I can't. That's the purpose of the disfoliation situation. And you look at, I think it's Martin v. Keeley and Boyd on disfoliation, and now we're looking at electronic media. I mean, that's preventing me from going forward. I think that's my rebuttal, but I want to check real quick if that's okay. One more thing. The scheme exception is utilized. There's a high burden, a very high burden on misrepresentation of fraud. And you have to be very specific, and I understand that. That's why there is a scheme exception in that regard. And the scheme exception in this case would relate to the emails and how they're eliminating these people from being there, because they just decided we don't want to sell it. I was sick for a while. They took over. We told everybody. Now I'm back. I don't want to sell it. With that, thank you for your time, unless you have another question. Thank you very much. We would like to thank the attorneys for their arguments today. And this case will be taken under advisement. We'll take a short recess.